Leddarius Wright,

                                    Plaintiff,

            v.

Jacquelyn Levitt, M.D. et al.,

                                    Defendants.

**Report and Recommendation**

13-CV-563V

## I.    INTRODUCTION

        Plaintiff Leddarius Wright is a state prison inmate who suffers from profound hearing loss. Audiology tests have confirmed that plaintiff is essentially deaf. Prison officials have attempted to accommodate plaintiff through written communications, lip reading, hearing-impaired assistance devices, and hearing aids. The hearing aids did not work, and at least one hearing-impaired counselor considered plaintiff's communication methods cumbersome and inadequate. To try to regain his hearing, following a psychiatric history that includes suicide attempts, plaintiff wanted to explore the possibility of obtaining cochlear implants. Prison medical staffers thought that plaintiff might be a candidate and requested a consultation to assess his eligibility. Plaintiff's mother offered to put the expense of cochlear implants on her insurance plan, if cost became an issue. Despite all the information that pointed in the direction of at least having a consultation, the prison system's contractual reviewer denied the request. Plaintiff sought prison administrative review of the denial but became lost in a bureaucratic cloud. Through a series of documents with a noticeable use of the passive voice, a decision that plaintiff's existing accommodations were adequate somehow was made. That decision, though, was made outside of formal channels, and defendants in their depositions could not identify exactly who made that decision or how.

Plaintiff consequently commenced suit under 42 U.S.C. § 1983, alleging in essence that defendants gave him a runaround about cochlear implants to the point that they were deliberately indifferent to his deafness and his resulting distress, in violation of the Eighth Amendment prohibition against cruel and unusual punishment. Following pretrial discovery, defendants filed a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 69.) Defendants argue that plaintiff never filed an inmate grievance and thus never exhausted administrative remedies; that any decisions that they made cannot rise to the level of deliberate indifference; and that one defendant in particular had no personal involvement in the situation. Plaintiff responds that his inability to obtain any clarity about a consultation made additional administrative remedies unavailable and crossed the threshold for deliberate indifference.

District Judge Lawrence J. Vilardo has referred this case to this Court under 28 U.S.C. § 636(b)(1)(A) and (B). (Dkt. No. 42.) The Court held oral argument on March 27, 2019. For the reasons below, the Court respectfully recommends denying defendants' motion.

## II.    BACKGROUND

This case concerns allegations that state prison officials damaged plaintiff's hearing and then refused him a treatment that would offset the resulting hearing loss in both ears. Plaintiff is in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") serving a sentence of 25 years to life for murder in the first degree and criminal possession of a weapon in the second degree. Prior to late 2009, the New York City Department of Correction housed plaintiff at the Rikers Island Correctional Facility ("Rikers Island"). While at Rikers Island, plaintiff complained about excessive wax buildup in his ears, a problem that he purportedly had since childhood. Rikers Island medical staffers performed a wax removal procedure on plaintiff around November 2008; that procedure, according to plaintiff, injured him and caused

significant bilateral hearing loss.[1]  Plaintiff underwent another wax removal procedure around May 2009 while in DOCCS custody at the Downstate Correctional Facility.  The second removal procedure allegedly caused further injury and left plaintiff nearly deaf in both ears.  Plaintiff saw an otolaryngologist on June 5, 2009.  The otolaryngologist determined that plaintiff's left tympanic membrane was not perforated but questioned whether there was blood behind it.  The otolaryngologist wanted to assess or to rule out plaintiff's hearing loss; audiology testing on June 10, 2009 was inconclusive, but additional testing on September 24, 2009 found severe hearing loss and suggested that plaintiff might be a candidate for cochlear implants.  On November 6, 2009, DOCCS transferred plaintiff to Wende Correctional Facility ("Wende").  The transfer occurred because staffers and administrators at Wende were better able to address the needs of inmates with hearing loss.

Medical and other personnel at Wende made a number of attempts to diagnose and to accommodate plaintiff's hearing loss.  When plaintiff arrived at Wende on November 6, 2009, staffers there provided him with hearing accommodations such as hearing aids, TTY services, a device called a Shake Awake Alarm, and a sound amplification device called a Pocket Talker.  (Dkt. No. 27-3 at 1.)  Audiology testing that concluded on January 25, 2010 showed that plaintiff's left ear had profound hearing loss and his right ear had moderate to profound hearing loss.  Based on the testing results and the prior suggestions that he might be a candidate for cochlear implants, plaintiff in February 2010 began to report to Wende medical staff that he "wanted to be able to hear again."  Plaintiff became interested in cochlear implants but was open to other remedies that would help him hear.  Meanwhile, further audiology testing on March 30, 2010 rated plaintiff as deaf.  Corrections

---

[1] At oral argument, the parties did not necessarily agree as to exactly how the loss occurred but did agree that it occurred while plaintiff was housed at Rikers Island.

officers in plaintiff's housing block had to receive permission to provide plaintiff his meals in his cell, because plaintiff could not hear them when they yelled, "mess hall." Another audiology consultation occurred on April 27, 2010 to address the need for a hearing aid. The audiologist recommended a consultation to assess plaintiff's eligibility for cochlear implants. The request for a consultation about cochlear implants went to a DOCCS independent utilization review vendor called APS Healthcare. APS Healthcare denied the request. The denial seems to have occurred because plaintiff had not first tried hearing aids as an alternative to cochlear implants. Wende personnel responded to the denial with an alternative request for an audiology consultation on May 13, 2010. The new consultation would be for hearing aids as opposed to cochlear implants. The consultation occurred on June 11, 2010; at the consultation, plaintiff was advised that he would need to give hearing aids a good try before cochlear implants could be considered. Additional consultations occurred on June 29 and July 27, 2010. At the latter consultation, plaintiff received his hearing aids along with instructions about use and care. (*See* Dkt. No. 71-1 at 44.) By October 2010, plaintiff indicated that the hearing aids were not helping him with his hearing loss. On October 23, 2010, Wende personnel made another request for a consultation to evaluate plaintiff's eligibility for cochlear implants. An audiological report from November 9, 2010 supported the request by noting that plaintiff experienced a severe to profound hearing loss and that he reported little benefit from trying hearing aids for three months. (Dkt. No. 71-1 at 37.) The request for a consultation about cochlear implants went to APS Healthcare, and APS Healthcare denied the request.

The parties diverge as to what procedural steps occurred, or should have occurred, in response to the second denial from APS Healthcare for a consultation about cochlear implants. According to defendants, a denial from APS Healthcare for consultations or specialty care goes to

the DOCCS Regional Medical Director ("RMD"). The RMD can decide that the consultation or the specialty care in question constitutes a medical necessity and can overturn any denial. Defendants assert that defendant Misa was the RMD at the time of the denials. Misa upheld the first denial. When Misa reviewed the second denial, she "instructed the facility medical team to send a report to her and Defendant Koenigsmann [the Chief Medical Officer at Wende] on inmate Wright's history of deafness, current functional status and accommodations." (Dkt. No. 70 at 9–10.) Reports did follow. Medical staffers and hearing-impaired counselors provided feedback. "The Correction Officers advised that inmate Wright did not have any difficulties with day-to-day activities: he was able to communicate with the officers, he was going to recreation and he had social contacts." (*Id.* at 10; *see also* Dkt. Nos. 71-4, 71-5.) One counselor testified, though, that plaintiff "had minimal lip reading abilities and his primary mode of communication was writing back and forth." (Dkt. No. 77-9 at 7.) The same counselor testified as the adequacy of the accommodations offered plaintiff short of cochlear implants:

> Q. Do you agree with the assessment or the comment in the 2/9/11 note that Mr. Wright, back in early 2011, communicated well by lip reading?
>
> A. Based on my experience with him, I don't believe lip reading is [an] adequate form of communication.
>
> Q. And I think you said before that he primarily relies on writing?
>
> A. Right. Pencil and paper.
>
> Q. And obviously when he's writing he can adequately express his thoughts?
>
> A. Right, whatever is needed to be said.
>
> Q. If that is the case for Mr. Wright today, and I know he's no longer at Wende, do you believe that if he needs to write his thoughts and read responses that that is adequate communication for an HL-10 inmate?
>
> MR. SLEIGHT: Form. Go ahead.

THE WITNESS: It's—I wouldn't call it adequate. It's a form of communication. But it's cumbersome and slow.

(Dkt. No. 77-9 at 12.) Defendant Post, the Deputy Superintendent for Health at Wende, went ahead and wrote a memo to Koenigsmann concluding that "[i]t appears [from other available information] that at this time the reasonable accommodations provided for Mr. Wright are adequate." (Dkt. No. 71-3.) Plaintiff and his mother eventually learned, from Post, that defendants decided that they had made reasonable accommodations to allow plaintiff to communicate adequately. (Dkt. No. 70-5 at 1.) Nonetheless, the RMD appears never to have adjudicated the second denial from APS Healthcare in the same way as the first denial. The need for this adjudication has support from Koenigsmann's deposition testimony:

> Q. What was the process that had to take place in order for a denial or a decision that the request was denied was finalized? Do you understand what I mean?
>
> A. Well, the provider makes the request, and that's what's shown here. The type of service was specified and it was requested by the nurse practitioner. That would go to—that request would automatically, digitally, whatever you want to call it, would go to APS for review. APS would review it and if they felt they needed more information they would send it back and ask specific questions to be answered. And when they felt they had sufficient information they would make a decision—they would make a decision. If they felt that there is no medical necessity for this consultation to be done they would preliminarily deny it.
>
> Q. When you say *preliminarily deny it*, what do you mean?
>
> A. They would deny it. But for them it's a preliminary denial, that's what we call it. Which means that that denial automatically goes to a regional medical director for review. The regional medical director would review it and then make a decision. If the regional medical director agrees with the denial, then the consultation is denied and it goes no further. If the regional medical director disagrees with the denial, then they would approve it. And that approval automatically goes to schedulers to have the request—to have the request scheduled, whatever it is.

(Dkt. No. 70-3 at 7–8.) The RMD herself, Misa, contradicted the above testimony by suggesting that the review of the second denial was not her responsibility:

Q. You were the regional medical director and you were the person who needed to review this in order to determine whether you should reinforce the denial or overturn the denial, correct?

A. Correct.

Q. And what were the criteria that you used back in November of 2010 to determine whether or not you should reinforce or overturn the denial?

A. Well, at this point I was requesting extra information.

Q. And is that the information that you requested in the decision comments section?

A. Correct.

Q. Do you know whether you ever got that information?

A. I don't recall.

Q. Do you know whether you ever made a decision as to whether to reinforce or overturn the denial?

A. I believe I sent it up to the chief medical officer.

Q. And who was the chief medical officer?

A. In 2010, I'm not sure if it was still Dr. Wright or if Dr. Koenigsmann had taken over.

Q. And why would you have sent that request up to the chief medical officer?

A. Because it was a major procedure and the decision was up to the chief medical officer.

Q. So you did not feel that you had the authority to make the decision as to whether to reinforce or overturn the denial at that time?

A. Correct.

Q. Do you know whether the chief medical officer ever made such a decision?

A. No, I don't know.

(Dkt. No. 77-7 at 6–7.) Misa then raised the possibility that a treating physician would have to be

involved in the review of a denial:

Q. And, if as we sit here today in 2018 Mr. Wright has not been evaluated by an

7

otolaryngologist as was suggested in the initial request for consultation, would you still consider that an ongoing process of evaluation?  Do you see what I'm saying?

A. No.

Q. If he has not yet had this consultation despite that the request was made in 2010 and it's now 2018, would you still consider this an open issue, an issue that could be resolved if it was deemed to be medically necessary for the patient?

A. He was not evaluated by this particular person.  Was he ever evaluated by another ENT?  I don't know.

Q. Well, if he wasn't evaluated by an ENT at all since the time this request was made, would you consider that an open issue, that it's still an ongoing process of evaluation?

A. Well, it's hard to say.  I'm not directly providing.  I'm not the physician directly providing the care.  That would have to—you know.  That would have to depend on the person who sees him on a daily basis or monthly basis, however way they're evaluating him.  It would be on that physician.

(Dkt. No. 77-7 at 17–18.)  But another defendant, Wende physician Jacquelyn Levitt ("Levitt"), foreclosed the possibility that a treating physician could fill the role that Koenigsmann and Misa could not agree to assume themselves:

Q. I know this is not the case because he's obviously incarcerated, but if he were not incarcerated and he was able to pay for and go for cochlear implants, is it your opinion that that would not be in his best interest?

A. I wouldn't think—I mean, it won't just be his private doctor, his P.M.D., it would be the ear, nose and throat doctor who would make that decision as well as—I mean, I don't think anyone else would probably decide that he would be best served by having an implant, even if he physically could have it.  That's another question which was never fully explored because he didn't go to the ear, nose and throat doctor.  We don't even know if he was a candidate.

Q. Why didn't he go to the ear, nose and throat doctor?

A. Because if the purpose of it was to evaluate him for an implant, and if he's not going to, we don't recommend the implant, then the ENT doctor really has no role.

(Dkt. No. 77-10 at 9.)  The apparent absence of a clear procedural event regarding the second denial

8

is the reason why plaintiff has a different perspective of the events that unfolded:

> Q. We know from Exhibit 5, which is a memo from Ms. Levitt to Leddarius Wright, the inmate, that after a review of his records, it was determined that the reasonable accommodations that have been provided obviated the need to pursue a cochlear implant. Is that a medical determination?

> A. I don't know what you mean by a medical determination. It—I support the use of how the inmate was accommodated in the decision process for going to potentially serious surgery versus a more conservative approach by the level of his accommodation.

> Q. But that's not the question.

> A. Okay.

> Q. The question is, where is the medical determination as to whether the APS denial of the otolaryngology request was right or wrong?

> A. I don't know how to answer that question.

(Dkt. No. 70-3 at 17–18.) One clue as to that answer appears in a clinical note from November 23, 2010, the clinical note that summarized the second request for a consultation. Under the heading "Reason for Consultation," the note states, "Eval[uation] with E. Diaz-Ordaz, MD for cochlear implant surgery. Inmate has had aud[iological] testing, ABR's [auditory brainstem responses] confirming severe to profound hearing loss. He has trialed [sic] hearing aids and received poor benefit with amplification—unable to repeat words and sentences. Buf[falo] hearing and speech team of audiologist/speech pathologist and ENT indicate [that] L Wright is [a] candidate for cochlear implant." (Dkt. No. 71-1 at 34.) Under the stated reason for the consultation request, two codes appear. One code reads, "Decision: D Denied 11/23/2010." (*Id.*) The second code is an explanation of the first and reads, "Reason: 07 Req RMD Rvw." The two codes suggest that plaintiff might have been caught in a bureaucratic circle: APS Healthcare denied the second request for consultation because no RMD review occurred first, but no RMD review apparently was forthcoming that would address APS Healthcare's decision. (*See also* Dkt. No. 77-7 at 5.) According

9

to plaintiff, he never sought a second medical opinion and never filed an inmate grievance over the second APS Healthcare denial because he kept waiting—and technically is still waiting—for a formal decision from the RMD. So long as that formal decision never came, according to plaintiff, he reasonably believed that he had a chance at obtaining a consultation for cochlear implants. Plaintiff was particularly eager for the consultation because of finances. Plaintiff and his mother informed defendants that plaintiff's mother's insurance at the time would have covered the cost of cochlear implants. (Dkt. No. 70-4 at 1.) To the extent, then, that defendants' reluctance to explore cochlear implants stemmed from concerns about cost, plaintiff and his mother wanted to allay those concerns.[2]

The record contains the following statement from an expert witness—the Medical Director of the Ventura County Jail in California—that summarizes the procedural events that led plaintiff to file suit:

> So, to reiterate if Dr. K [Koenigsmann] believed that CI [cochlear implant] surgery was done by NYS DOCCS for the right candidate and that it required an ENT exam to make that determination and he refused to make a decision then he did in fact make a decision but did not notify the Regional Medical Director. He allegedly did not contact the Medical Director of Wende Prison, the private treating physician and the treating nurse practitioner. That would be a breach of his policies, a breach of the standard of care and would be Deliberate Indifference. This is based on Dr. K. [k]nowing that there is a fixable problem, knowing DOCCS was complicit in causing the problem and doing nothing to fix the problem. He knew DOCCS has fixed this problem in the past and that the inmate spent at least a few more years with communication that is "I wouldn't call it adequate . . . slow and cumbersome."

> My opinion is to a reasonable degree of medical certainty and is based on the material I reviewed. I reserve the right to modify my opinion based on new information.

(Dkt. No. 70-8 at 4.) Another medical expert reviewed plaintiff's medical records and opined, albeit

---

[2] At oral argument, defendants alluded to a possible reason for their reluctance to see plaintiff receive cochlear implants: the fact that cochlear implant surgery is not a "magic bullet" and that a long period of therapy is necessary to calibrate the implants.

in conclusory fashion, that plaintiff was a proper candidate for cochlear implants. (Dkt. No. 70-9 at 1.)

This case began when plaintiff filed his original complaint in the Southern District of New York on April 3, 2013. (Dkt. No. 1.) The case soon transferred to this District, and after some initial proceedings, plaintiff filed an amended complaint on November 1, 2016. (Dkt. No. 43.) The amended complaint names Levitt, Post, Koenigsmann, and Misa as defendants. The amended complaint contains one claim for deliberate indifference to medical needs in violation of the Eighth Amendment (by way of 42 U.S.C. § 1983).

Defendants filed the pending motion on October 29, 2018. Defendants advance three arguments in favor of summary judgment. Defendants argue that plaintiff failed to exhaust administrative remedies when he failed to appeal the second denial by APS Healthcare and when he failed to file an inmate grievance over the issue of cochlear implants. "In the instant case, there is no evidence that Plaintiff file[d] an inmate grievance in connection with the claim he asserts in this action. There is further no evidence that Plaintiff appealed the denial of an inmate grievance all the way up to CORC." (Dkt. No. 72 at 5; *see also* Dkt. No. 83 at 2.) Defendants argue further that plaintiff simply has not presented any evidence that a reasonable jury could use to establish deliberate indifference. "Here, Plaintiff cannot establish either prong of the analysis. As to the first component of the objective prong, while losing one's hearing is certainly unpleasant and complicating, the fact that Defendants determined that a cochlear implant was not medically necessary because Plaintiff was able to function in the prison setting without one certainly does not rise to the level of a need that could result in further significant injury or the 'unnecessary and wanton infliction of pain.' As Dr. Mesa testified in her deposition, while a cochlear implant might be nice to have, it was not medically necessary." (Dkt. No. 72 at 7.) "As to the second component

of the objective prong, the record before the Court on this motion establishes that the Defendants, and DOCCS health care system in general, provided Plaintiff treatment over and above that which most people not in prison would have gotten." (*Id.* at 8.) Finally, defendants assert that, no matter what happens with their first two arguments, "there is no evidence in the record that Defendant Post was involved in the decision not pursue a cochlear implant for Plaintiff. She testified unequivocally at her deposition that she was not involved in patient care decisions." (*Id.* at 10.) Summary judgment, according to defendants, thus would be appropriate for defendant Post under any circumstances.

Plaintiff opposes defendants' motion in all respects. With respect to administrative remedies, plaintiff highlights the contradictory information that defendants have provided about whether RMD review ever occurred and who was responsible for reviewing the second denial from APS Healthcare. (Dkt. No. 76 at 3.) As plaintiff explains,

> Even if the Court were to decide that there was a clear administrative [process] in the sense that the denial of the ENT visit went through the appeals channel, according to Dr. Misa the last round of review by Dr. Koenigsmann never took place. Thus, the appeals process was never brought to resolution and there was nothing the plaintiff could properly have done to grieve it. Essentially, the denial of the visit by the third-party medical administrator remains undecided 8 years after Dr. Misa sent it to Dr. Koenigsmann for review.

(*Id.* at 5.) With respect to medical indifference, plaintiff argues that he lost his hearing while in prison and has been desperate to regain it. Plaintiff at oral argument asserted that other inmates have received cochlear implants and that the distress from his deafness led to beatings from inmates who thought that he was ignoring them. Deafness also has caused significant psychiatric issues including suicide attempts. Plaintiff argues further that a jury will need to assess why defendants insisted on leaving medical review unresolved and denying him a chance at cochlear implants, when his medical records confirm a profound hearing loss; when his hearing aids proved ineffective; and

when his mother even offered to assume any necessary costs through her insurance.  (*Id.* at 8.)  As for the argument about defendant Post's involvement, plaintiff argues implicitly against removing her from the case when he notes that "[n]o document or testimony offered by the defendants in support of the motion explains why the other defendants involved felt Dr. Koenigsmann's input was needed but that he denies any involvement."  (*Id.* at 11.)  Plaintiff does not otherwise address Post's involvement explicitly.

## III.  DISCUSSION

### A.  *Summary Judgment Generally*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FRCP 56(a).  "As to materiality, the substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment . . . . More important for present purposes, summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted).  "The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists.  In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant . . . . Summary judgment is improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party."  *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).  "Where, as here, the nonmovant would bear the burden of proof at trial, the movant may show prima facie entitlement to summary judgment by either (1) pointing to evidence that negates its opponent's claims or (2)

identifying those portions of its opponent's evidence that demonstrate the absence of a genuine issue of material fact." *Barlow v. Male Geneva Police Officer who Arrested me on Jan. 2005*, 434 F. App'x 22, 25 (2d Cir. 2011) (summary order) (internal quotation and editorial marks and citation omitted).

### B. Exhaustion of Administrative Remedies

The Court will assess first defendants' argument that plaintiff failed to exhaust administrative remedies. "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "Under § 1997e(a), the exhaustion requirement hinges on the 'availability' of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones." *Ross v. Blake*, ___ U.S. ___, 136 S. Ct. 1850, 1858 (2016) (editorial marks omitted). "[A]n administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates. Suppose, for example, that a prison handbook directs inmates to submit their grievances to a particular administrative office—but in practice that office disclaims the capacity to consider those petitions. The procedure is not then 'capable of use' for the pertinent purpose . . . . Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* at 1859 (citation omitted). Unavailable remedies include procedural steps that would be considered premature if inmates invoked them before receiving formal responses to preceding steps. *Cf. Carter v. Revine*, No. 3:14-CV-01553 (VLB), 2017 WL 2111594, at *11 (D. Conn. May 15, 2017) (grievance process rendered incapable of use when inmate received no response after transfer); *Holloway v. Corr. Med. Servs.*, No. 4:06CV1235 CDP, 2007 WL 1445701, at *5 (E.D. Mo.

May 11, 2007) (administrative remedies sufficiently exhausted when inmate received no response to a request related to medical treatment).  Unavailability of administrative remedies can result also from ambiguity about how to navigate parallel processes.  *See Carter*, 2017 WL 2111594, at *14 ("The procedural ambiguity Carter faced was exacerbated by the existence of a parallel process for medical staff.  In addition to the grievance process, there was also a medical review process, both of which used the same forms.").

Here, the Court cannot say with confidence that plaintiff exhausted available administrative remedies.  The entirety of defendants' argument is that plaintiff did not invoke the procedure for inmate grievances found at 7 N.Y.C.R.R. § 701.7, a regulation governing how to file a grievance while in a special housing unit.  There are several problems with this argument.  Before reaching Section 701.7, defendants would have to address the general policy set forth at Section 701.3:

> An inmate is encouraged to resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance.  Although a facility may not impose preconditions for submission of a grievance, the failure of an inmate to attempt to resolve a problem on his/her own may result in the dismissal and closing of a grievance at an IGRC hearing.

7 N.Y.C.R.R. § 701.3(a).  Section 701.3 might have required a denial of any grievance if plaintiff had attempted to file one before receiving final word from the RMD.  Additionally, and subject to further factual development, the involvement of APS Healthcare and officials outside Wende in plaintiff's requests for ENT consultations might evoke Section 701.3(e) and make the denial of the second consultation request non-grievable.  *See id.* § 701.3(e)(1) ("An individual decision or disposition of any current or subsequent program or procedure having a written appeal mechanism which extends review to outside the facility shall be considered non-grievable.").  Going further, the process for medical review appears to be parallel to the standard inmate grievance process, and defendants might have caused confusion as to what next steps in the medical review might have

been available. Defendants gave plaintiff and his mother a copy of DOCCS Health Policy 7.02 in response to inquiries about the incomplete review from the RMD. (Dkt. No. 70-5 at 2–3.) Health Policy 7.02, however, is titled "Inmate Provider of Choice" and appears to be a procedure whereby inmates can ask to see specialists of their own choice at their own expense. *Cf. Rucano v. Koenigsmann*, No. 9:12-CV-00035 MAD, 2014 WL 1292281, at *4 (N.D.N.Y. Mar. 31, 2014) ("Defendant Oliveira told Plaintiff that pursuant to § 7.02 of the Health Services Policy Manual ('HSPM') Plaintiff could get his own dentist to handle the crowns, but that he would not provide crowns for Plaintiff."). Whether plaintiff could seek his own specialist at his own expense does not appear to answer the need for RMD review. As the record shows, Wende staffers made the first request for consultation about cochlear implants in plaintiff's behalf. The first request for a consultation about cochlear implants was denied by APS Healthcare. Misa, as the RMD, reviewed that denial and made the definitive decision to affirm that denial. Everyone involved appears to have accepted that an official review from the RMD ended the inquiry. For some reason, though, no one could agree as to what should have happened with the denial of the second consultation request. Misa still was the RMD; the record is undisputed that she never gave the same official review to the second request that she gave to the first request. Instead, as the Court has cited above, Koenigsmann passed responsibility to Misa; Misa pointed to Koenigsmann or to an unspecified treating physician, possibly alluding to Levitt; Levitt closed the circular reasoning by testifying that a treating physician would have had no role because defendants already had decided against cochlear implants; and everyone meanwhile was ignoring plaintiff's psychiatric history and the hearing-impaired counselor's opinion that plaintiff's means of communication were cumbersome and not adequate. The confusion regarding who did what and why includes Post. A more explicit argument from plaintiff would have been helpful, but

16

plaintiff clearly has shown that Post issued a memo, and a letter to plaintiff's mother, whose purpose has to have been to influence the decision to continue to deny plaintiff access to cochlear implants.

In the face of all of the administrative confusion that appears in the record, a reasonable jury could conclude that the review of the second denial never officially ended and that plaintiff would have been uncertain about what to do next. Under these circumstances, the safer course of action will be to allow all defendants, including Post, to develop definitively at trial what the medical procedures should have been and what plaintiff should have done about them. If defendants can make clear at trial who had what responsibilities and whom plaintiff was supposed to contact then they can renew their arguments through Rule 50 motion practice. For now, the Court respectfully recommends denying defendants' motion with respect to administrative remedies and the involvement of Post.

### C. Deliberate Indifference to Medical Needs

Regardless of the Court's first recommendation above, plaintiff does not get to trial unless defendants establish that no triable issue of fact exists about the severity of his medical condition and how they handled it. "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove deliberate indifference to his serious medical needs. The standard of deliberate indifference includes both subjective and objective components. First, the alleged deprivation must be, in objective terms, sufficiently serious. Second, the defendant must act with a sufficiently culpable state of mind. An official acts with the requisite deliberate indifference when that official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotation and editorial marks and citations omitted). "[A] medical need

is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999) (citation omitted).  Relevant factors include, but are not limited to, "(1) whether a reasonable doctor or patient would perceive the medical need in question as important and worthy of comment or treatment, (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003) (internal quotation marks and citations omitted).

Here, defendants have not met their burden.  Subject to any proof that might be necessary at trial, the record suggests that plaintiff developed his profound hearing loss while in prison.  *Cf. Hardy v. City of New York*, 732 F. Supp. 2d 112, 135 (E.D.N.Y. 2010) (questions of fact surrounded treatment of ear pain and resulting left ear deafness).  Through some of the accommodations given to plaintiff so far, defendants have acknowledged that plaintiff faces disciplinary and other risks if he cannot hear threats from other inmates or commands from correctional officers.  Hearing loss causing deafness has been recognized as a severe impairment requiring serious medical attention.  *See Wheeler v. Butler*, 209 F. App'x 14, 15 (2d Cir. 2006) (summary order) (deprivation of hearing aids could amount to cruel and unusual punishment under the right circumstances); *Rennalls v. Alfredo*, No. 12-CV-5300 KMK, 2015 WL 5730332, at *11 (S.D.N.Y. Sept. 30, 2015) (objective prong of deliberate indifference claim sufficiently pled based on failure to receive hearing aid) (citations omitted); *Degrafinreid v. Ricks*, 417 F. Supp. 2d 403, 412 (S.D.N.Y. 2006) ("Objectively, the ability to hear is a basic human need affecting daily activity and sufficiently serious to warrant treatment by physicians.").  To their credit, defendants did give plaintiff's condition enough attention that they tried various accommodations for day-to-day communication; they fitted him for hearing aids; and

they requested a consultation for cochlear implants twice. That said, though, the initial accommodations are not dispositive. "If a defendant consciously chose to disregard a nurse or doctor's directions in the face of medical risks, then he may well have exhibited the necessary deliberate indifference. Indeed, in some instances even prison doctors may be held liable for a failure to provide medical care recommended by other doctors." *Johnson v. Wright*, 234 F. Supp. 2d 352, 361 (S.D.N.Y. 2002) (internal quotation marks and citations omitted). The initial accommodations, in fact, have to be balanced against a noticeable unwillingness to conclude the medical review of the second denial. By the time of the second denial, the hearing-impaired counselor was convinced that plaintiff's methods of communication were not adequate. Plaintiff reported that his hearing aids were not working, and defendants appeared willing to believe him. Audiology reports confirmed profound hearing loss. To the extent that the cost of cochlear implants might have been an issue, plaintiff's mother was willing to help. There was no impediment to an ENT consultation for cochlear implants except for a final sign-off by the RMD; at oral argument, plaintiff noted that Misa testified at her deposition that she had the additional option of sending a third consultation request to APS Healthcare. Yet neither the final sign-off nor a third request ever happened. The confusion of opinions, documents, and testimony that happened instead indicates that plaintiff was unable to determine how to go forward. A jury should be allowed to examine why defendants were so unwilling to make a straightforward decision and to give a straightforward reason why plaintiff could not at least see an ENT doctor about cochlear implants.

To be clear, the issue for summary-judgment purposes is not the ultimate determination of whether plaintiff ought to have received cochlear implants. The Court does not know whether plaintiff ultimately should receive cochlear implants. Had an ENT been allowed to examine plaintiff, that ENT might have come up with medically reasonable contraindications for the

necessary surgery and adjustment therapy. For now, what matters is that plaintiff has a severe medical condition; that the severe medical condition never reached a consultation about a treatment that might have helped when other accommodations did not; and that the failure to reach a consultation occurred under circumstances that a reasonable jury could fault. *Cf. Hathaway v. Coughlin*, 37 F.3d 63, 68 (2d Cir. 1994) ("A jury could infer deliberate indifference from the fact that Foote knew the extent of Hathaway's pain, knew that the course of treatment was largely ineffective, and declined to do anything more to attempt to improve Hathaway's situation."). In this context, declaring no deliberate indifference as a matter of law would be inappropriate.

## IV.    CONCLUSION

For all of the foregoing reasons, the Court respectfully recommends denying defendants' motion (Dkt. No. 69).

## V.    OBJECTIONS

A copy of this Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below. "Within 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Any objections must be filed electronically with the Clerk of the Court through the CM/ECF system.

"As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point." *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted); *see also Mario v. P & C Food Markets, Inc.*, 313 F.3d 758, 766 (2d Cir. 2002) ("Where parties receive clear notice of the consequences, failure timely to object to a magistrate's report and recommendation operates as a waiver of further judicial review of the magistrate's decision.") (citation omitted). "We have adopted the rule that failure to object timely to a magistrate

judge's report may operate as a waiver of any further judicial review of the decision, as long as the parties receive clear notice of the consequences of their failure to object.  The rule is enforced under our supervisory powers and is a nonjurisdictional waiver provision whose violation we may excuse in the interest of justice."  *United States v. Male Juvenile (95-CR-1074)*, 121 F.3d 34, 38–39 (2d Cir. 1997) (internal quotation marks and citations omitted).

"Where a party only raises general objections, a district court need only satisfy itself there is no clear error on the face of the record.  Indeed, objections that are merely perfunctory responses argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original papers will not suffice to invoke de novo review.  Such objections would reduce the magistrate's work to something akin to a meaningless dress rehearsal."  *Owusu v. N.Y. State Ins.*, 655 F. Supp. 2d 308, 312–13 (S.D.N.Y. 2009) (internal quotation and editorial marks and citations omitted).

SO ORDERED.

___*/s Hugh B. Scott*_____
Hon. Hugh B. Scott
United States Magistrate Judge

DATED: June 27, 2019